John G. Balestriere
Jillian L. McNeil
**BALESTRIERE FARIELLO**
225 Broadway, 29th Floor
New York, New York 10007
Telephone:    (212) 374-5401
Facsimile:    (212) 208-2613
john.balestriere@balestrierefariello.com
jillian.mcneil@balestrierefariello.com
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**DESARROLLADORA FARALLON S. DE R.L. DE C.V.**

                              Plaintiff,

        - against –

**CARGILL, INC., CARGILL FINANCIAL SERVICES INTERNATIONAL, INC., CARVAL INVESTORS, LLC, RAMSFIELD HOSPITALITY FINANCIAL, MATTHEW BOGART, and THOMAS HUETTNER**,

                              Defendants.

Index No. _____

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Desarrolladora Farallon S. de. R.L. C.V ("Farallon" or "Plaintiff"), by its

attorneys, Balestriere Fariello, for its Complaint against Cargill, Inc. ("Cargill"), Cargill

Financial Services International, Inc. ("Cargill Financial"), CarVal Investors, LLC

("CarVal"), Ramsfield Hospitality Financial ("RHF"), Matthew Bogart ("Bogart"), and

Thomas Huettner ("Huettner", collectively with Cargill, Cargill Financial, CarVal, RHF,

and Bogart, "Defendants" or the "Cargill Parties") respectfully alleges as follows upon information and belief, except as to allegations concerning Plaintiff, which are made upon personal knowledge, and except as otherwise indicated herein.

## PRELIMINARY STATEMENT

1.     Plaintiff Farallon, the majority partner in the Capella Pedregal Resort and Spa, a five star luxury Mexican resort (the "Resort"), is forced to sue the Cargill Parties for years of broken agreements, breaches of fiduciary duty, and other misconduct resulting in Cargill's eventual, illegal takeover of the Resort.

2.     Through this misconduct, Cargill was able to position itself to control both the equity and debt of the joint venture it had originally entered into with Farallon to develop and run the Resort (the "Joint Venture").  Cargill thus took over one of Mexico's leading resorts, set on 23.7 acres of prime real estate in Cabo San Lucas, Baja California Sur, Mexico (the "Property").  The family behind Farallon, the Diaz Riveras, had owned this Property for decades.

3.     Defendants' misconduct includes actual perpetration of crimes in Mexico, along with egregious breaches of fiduciary duty—both in their initial role as an equity partner and their eventual role as lender to the Joint Venture that owns and manages the Resort—along with breaches of the Joint Venture agreement between Cargill and Farallon.  Because of this misconduct, Defendants have denied Farallon the many millions of dollars in equity value and profits it deserves.

4.     Farallon is the majority shareholder in the Resort, having itself contributed the Property which the Diaz Rivera family owned for decades and which

the parties valued at $18,500,000 in 2006, the actual concept for the Resort, and years of work in developing the Project in their home country where the Diaz Rivera family and its company, Farallon, have a solid reputation. Beginning with the patriarch of the Diaz Rivera family, Don Manuel Diaz Rivera, the Diaz Riveras and Farallon long had plans to develop the Property into one of the world's highest end resorts.

5.      In 2006, Farallon and the Cargill Parties came together to create a highly profitable resort in Cabo, one of the world's most prominent and developing vacation regions, at the very southern tip of Baja California in Mexico. Farallon and Cargill formed the Joint Venture for the purpose of developing and running the Resort, and, as a result of that Joint Venture, owed one another fiduciary duties. Cargill Financial and CarVal are wholly owned and controlled subsidiaries of Cargill, through which Cargill participated in the Project.

6.      Cargill first invested in a small residential development called El Rincon within Pedregal. Immediately thereafter, Cargill expressed an interest in Farallon's plan to develop its Property into what would become the Resort. To achieve what Farallon once believed was their shared vision, the parties created several entities to own and develop the Property, with Farallon maintaining a majority interest in the joint venture entity, Fideicomiso de Proyecto 00352 (the "CP Trust"), and the Cargill Parties investing capital in the Project.

7.      But once the Cargill Parties made the corporate decision to exit Latin America by 2011, they terminated the team dedicated to operating their Latin American investments (who had been on the Resort project from the onset), and brought in "work

out guys", including Huettner and, later, Bogart, to realize the greatest possible profits for Cargill regardless of the effect on the assets themselves.

8.     And since that time, Cargill has engaged in misconduct that has damaged Farallon, as detailed in this Complaint, including, simply by way of example, purchasing the debt of CP Trust in order to obtain control of the Project; installing as asset manager an entity owned by the Cargill Parties without revealing that to Farallon; abusing their dual roles as both equity holder and, eventually, lender to the Project; harassing individual members of the Diaz Rivera family; and, eventually, even ejecting the Diaz Rivera family from their own land.

## JURISDICTION AND VENUE

9.     This Court has diversity jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332(a)(2) as there is complete diversity amongst the Plaintiff, a partnership formed in Mexico by Mexican citizens, and Defendants, who are either companies that are incorporated in and have their principal places of business within the United States, or are individuals who reside in the United States.  The amount in controversy exceeds the sum of $75,000 exclusive of interest and costs.

10.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(3) as Defendants are subject to the Court's personal jurisdiction with respect to this action.

## PARTIES

### *Desarrolladora Farallon S. de. R.L. C.V*

11.     Plaintiff Farallon is a Mexican limited liability partnership with its registered office at Camino del la Plaza 145 Fraccionamiento El Pedregal 23453 Cabo San Lucas, Baja California Sur, Mexico.

### *Cargill, Inc.*

12.     Defendant Cargill is an American privately held, multinational corporation incorporated in Delaware with its principal place of business in Minnetonka, Minnesota.

13.     The Court has personal jurisdiction over Cargill as Cargill regularly conducts business in New York, New York, and the allegations against Cargill contained herein arise from Cargill's business transactions in New York, including those transactions with CarVal, RHF, and the bank known initially as WestLB, AG, and later as Portigon, AG ("WestLB").

14.     Cargill's registered agent in New York is CT Corporation System, located at 111 Eighth Avenue, New York, New York 10011.

### *Cargill Financial Services International, Inc.*

15.     Defendant Cargill Financial, Cargill's financial services arm, is a wholly-owned subsidiary of Cargill.  Cargill Financial is incorporated in Delaware, and located in Hopkins, Minnesota.

16.     The Court has personal jurisdiction over Cargill Financial as Cargill Financial regularly conducts business in New York, New York, and the allegations

against Cargill Financial contained herein arise from Cargill Financial's business transactions in New York, including those transactions with CarVal, RHF, and WestLB.

17.     Cargill Financial's registered agent in New York is CT Corporation System located at 111 Eighth Avenue, New York, New York 10011.

### CarVal Investors, LLC

18.     Defendant CarVal is a limited liability company formed in Delaware, with its principal place of business at 1095 Avenue of the Americas, New York, New York, 10036.  CarVal is a wholly-owned subsidiary of Cargill.

### Ramsfield Hospitality Financial

19.     Defendant RHF, a venture between CarVal Investors and Ramsfield Real Estate, is a hotel real estate investor, lender, and asset manager.

20.     This Court has personal jurisdiction over RHF, a corporation incorporated in Delaware and headquartered at 275 Madison Avenue, New York, New York, 10016.

### Matthew Bogart

21.     Defendant Bogart is the general counsel and chief compliance officer for CarVal.  He oversees all of CarVal's legal and compliance matters across the globe and is the current representative for Cargill in connection with the Project.  Bogart replaced Huettner after Huettner was terminated.   Bogart is the Cargill Parties' current representative on the Technical Committee of the CP Trust.

22.     Bogart resides at 6200 Belmore Ln., Hopkins MN 55343.

23.     This Court has personal jurisdiction over Matthew Bogart as he is the general counsel and chief compliance officer for CarVal Investors, Inc., a corporation

6

incorporated in Delaware and headquartered in New York, New York.  On information and belief, Bogart travels frequently travels to New York to conduct business in his role as general counsel and chief compliance officer for CarVal.

### *Thomas Huettner*

24.    Defendant Huettner was the Managing Director/Head of Global Real Estate Portfolio for CarVal and was the representative of the Cargill Parties in connection with the Project until he was replaced by Bogart in 2014.  Huettner was CarVal's representative on the Technical Committee of CP Trust from 2011 until 2014.

25.    Huettner resides at 1700 11th Ave. N., Plymouth, MN 55447.

26.    This Court has personal jurisdiction over Thomas Huettner as he is the former Managing Director/Head of Global Real Estate Portfolio Management for CarVal Investors, Inc., a corporation incorporated in Delaware and headquartered in New York, New York.  On information and belief, Huettner frequently travels to New York to conduct business.

## STATEMENT OF FACTS

### Background

27.    The Diaz Rivera family has owned 23.7 acres of property at the tip of the Baja California Peninsula in Cabo San Lucas Mexico for decades.  The Property was purchased by patriarch Don Manuel Diaz Rivera in the 1970s as part of a much larger land assemblage that would later become Pedregal de Cabo San Lucas.  Don Manuel Diaz Rivera intended for this purchase to become an investment that would provide for his family for generations to come.

28.     Don Manual knew that if he and his children made it their lifelong project to cultivate and develop the land into his vision of a seaside paradise it would become a vacation haven for luxury second home buyers, and that his children and grandchildren would realize financial returns and other non-monetary benefits on his visionary investment. Such was Don Manuel's dream and his hoped for legacy. Don Manuel's grandson, Juan Diaz Rivera, presently is the Farallon member who has taken lead in the Project's development.

29.     The Diaz Rivera family honored Don Manuel's vision by maintaining the Property throughout the next decade, which included some difficult financial times. Throughout the 1980s, the Diaz Rivera family held onto the land that today comprises the Capella Pedregal Resort, even though doing so caused them to incur tremendous personal expense. In 1982, when the Mexican peso plummeted in value against other currencies, the family was forced to sell other assets—including the engagement ring of Don Manuel's wife and the family matriarch—in order to meet the Property's debt service burden, which was payable in U.S. dollars.

30.     After surmounting these great obstacles to hold onto the Property through the 1980s and 1990s, the Diaz Rivera family founded Farallon in 2001 to manage certain aspects of the family's business, the most significant of which was the development of the 23.7 acres that was later to become the site of the Resort. When Cabo San Lucas began to attract worldwide interest as a luxury vacation destination in the late 1990s and early 2000s, the Diaz Rivera family believed it was time to capitalize on their patriarch's visionary investment.

31.     Their plan was to build and develop a luxury destination resort that would include both high-end hotel and residential properties sold on a whole and a fractional basis, as well amenities such as five star restaurants and a full-service spa.

32.     The Diaz Rivera Family, through Farallon, began to search for investment capital to help them realize their vision for redeveloping their family Property.  Soon thereafter, Farallon and the Diaz Rivera family were introduced to Cargill through an equity broker named Jeffery Alexopolus.

### Cargill, Cargill Financial, and CarVal

33.     Cargill is an American, privately held, primarily agricultural corporation based in Minnetonka, Minnesota, a Minneapolis suburb.  Founded in 1865, it is now the largest privately held corporation in the United States in terms of revenue.  If Cargill were a public company, it would rank, as of 2013, number 9 on the Fortune 500 list, just ahead of Ford Motor Company.

34.     Cargill's business is primarily agriculture (such as trading, purchasing, and distributing grain and other agricultural commodities; raising livestock and producing feed; and producing food ingredients such as starch and fats for application in processed foods).

35.     Cargill also has a highly sophisticated, and simply enormous, financial services arm, Cargill Financial, which manages financial risks in the commodity markets for the company.  For example, Cargill Financial owns its own hedge fund, CarVal, which has about $10 billion in assets and liabilities.

36.     Cargill remains a family-owned business, as the descendants of the founder (from the Cargill and MacMillan families) own over 85% of the company.  As such, the company is not answerable to public scrutiny or market regulations for its corporate conduct in the same way that public companies are.

37.     While Cargill publicly touts its commitment to "ethical and compliance standards for conducting [its] business throughout the world," even establishing seven "Guiding Principles" which include "obey[ing] the law," "conduct[ing its] business with integrity," "honoring business obligations," "treat[ing] people with dignity and respect," and "commit[ing itself] to being a responsible global citizen," the facts giving rise to this Complaint demonstrate quite the opposite.

### Cargill (through Cargill Financial and CarVal) and Farallon Enter Into a Joint Venture

38.     After being introduced through an intermediary as a source of investment capital to Farallon, to help realize the Diaz Rivera Family's vision for the planned five star luxury Resort in Cabo, Farallon and Cargill agreed on a development plan and entered into a Joint Venture on May 17, 2006, to work together to own, develop, and run the Resort.

39.     At the onset of the Joint Venture, Farallon contributed 23.7 acres of waterfront property, which in 2006 had a fair market value of $18,500,000, while Cargill contributed $15,000,000 in cash in exchange for a minority stake.  The Gleason Foundation, brought to the Joint Venture by Farallon, initially invested $6,000,000 for the Project, structured as a loan.

40.     Farallon and Cargill agreed that Farallon would hold a majority 55.22% interest in the Project, while Cargill would hold the remaining 44.78% minority share.

41.     Under Mexican law, Farallon and Cargill were required to create a business trust to own the Property.  Thus, they created the CP Trust.  The settlors and beneficiaries of the CP Trust are Farallon and a Mexican entity created, owned, and controlled by Cargill for the specific purpose of holding its interest in the Project. Cargill named this entity Mexvalo.

42.     In Mexico, this type of trust is governed by a management committee known as a technical committee.  From the beginning of the Joint Venture, Cargill and Farallon agreed that the technical committee would always be comprised of three individuals: (1) a representative of Cargill, (2) a representative of Farallon, and (3) a representative of HVI (the development company founded by Juan Diaz Rivera and Defendant Holland).

43.     Thus, the technical committee of the CP Trust was initially composed of Adam Bernier on behalf of Cargill, Juan Diaz Rivera on behalf of Farallon, and Richard Holland on behalf of HVI (the "Technical Committee").   In 2011, Cargill's representative, Adam Bernier was replaced by Thomas Huettner, a CarVal employee and one of Cargill's "work out guys".  Huettner was then replaced by CarVal employee Bogart in 2014.  Until Cargill wrongfully removed Juan Diaz Rivera in 2014, as detailed below, the other members of the Technical Committee remained the same.

44.     Consistent with the practice for real estate projects in Mexico, the Technical Committee was tasked with exclusive oversight of the business, affairs, and

11

management of the Joint Venture, and a significant number of corporate actions which required either a majority or unanimous vote to be authorized.  Under the provisions of the CP Trust Governance Agreement, no meeting of the Technical Committee could be validly held without the Farallon representative present.

45.     At some point after Cargill and Farallon entered into their Joint Venture Agreement, Cargill began to run its real estate investments through Cargill Financial's wholly owned and controlled subsidiary, CarVal.  Throughout its interactions with the Project and with Farallon, Cargill Financial and CarVal have operated as the alter ego of Cargill, so that the three entities are indistinguishable for purposes of this Complaint.

### Capella and the Operating Agreement

46.     A resort the size of the Project is typically managed by a third-party hotel management company.  To fill that role, Farallon introduced The West Pace Hotel Group ("WPHG"), which operated under the newly-formed hotel brand, Capella, to the Joint Venture to act as manager of the Resort.  Prior to the formation of the Joint Venture, Farallon had entered into an operating agreement with WPHG.  After the Joint Venture was formed, Farallon signed a contribution agreement through which they would contribute the signed agreement to the CP Trust.  The Capella operating agreement has since been assigned to Hoteles, an entity formed by the CP Trust.

47.     While it was in 2006 a new hotel brand, Capella was formed by the individuals behind the rejuvenation of the Ritz Carlton brand, who had over the past decade pushed Ritz Carlton to the top of the luxury hotel business.  Farallon and Cargill as Resort "owners," on the one hand, and WPHG, as hotel operator, on the other,

entered into an operating agreement (the "Operating Agreement"), a technical services agreement, and a license agreement (collectively the "Hotel Agreements") relating to the construction and ultimate operation of the Resort.

48.     The Operating Agreement governs the management of the Resort on behalf of its equity owners, Farallon and Cargill.

**The Joint Venture Enters Into a Construction Loan Agreement with WestLB**

49.     Consistent with the Joint Venture's plan, the next step in the development of the Property was for the CP Trust to secure a loan to fund the construction of the Resort.

50.     Cargill and Farallon negotiated a loan agreement with the New York branch of WestLB, a German bank, to fund the construction of the hotel and related condominium units on the Property owned by the Diaz Rivera Family (the "Loan Agreement").   WestLB agreed to loan the CP Trust a principal amount of up to $65,000,000 for the Project (the "Construction Loan").  Farallon, Mexvalo, and HVI each guaranteed the Construction Loan.

51.     The Construction Loan was structured in two phases, the first phase funded at pre-construction, and the second phase to be funded after a certain percentage of completion.

52.     However, in 2008, after the first round of funding, WestLB was placed in receivership by German banking authorities and consequently failed to fund the second phase of the Construction Loan.  This placed the Project in a cash crunch at a key time in the development of the Project—when the Resort was only half built.

13

53.     Desperate for funds to continue its half-built Project, the Joint Venture began to seek other sources of funding, which proved difficult to obtain during the heart of the credit crisis in 2008 to 2009.  Cargill offered that the way forward would be to obtain a short-term mezzanine loan from a third party to continue the development of the Resort.  Cargill said that it would take the lead in finding alternative sources of funding in the debt markets.

54.     However, at the conclusion of that search, Cargill presented just one candidate to provide financing: RHF, a real estate asset management company.  While presenting RHF as an arms' length third-party lender, Cargill concealed from Farallon the significant fact that RHF was in fact controlled by Cargill.

55.     While Cargill later brought RHF to the Project as an asset manager—again failing to disclose that Cargill in fact controls RHF (*see* discussion *infra* ¶¶ 63-71)—the Joint Venture agreed to provide adequate financing to complete the construction of the Resort.  Cargill offered to provide the bulk of the funds as a partner loan (the "Mezzanine Loan"), and promised to re-document and re-structure the Mezzanine Loan so as to conform to the agreement with its partner in the Joint Venture, Farallon.  At the same time, Farallon also agreed to provide a partner loan of approximately $800,000.

56.     Cargill, however, never followed through on its promise to restructure its Mezzanine Loan to make it more equitable and in line with the goals of the Joint Venture.

## The Hotel and Fractional Ownership Properties Are Developed

57.     From 2006-2009, the Joint Venture built and developed the Resort under the direction of HVI, a development partnership between Farallon, and Richard Holland's company, Hotel Ventures International, LLC.

58.     During all of this time, the CP Trust paid its debt service to WestLB through a combination of sales proceeds, hotel proceeds, and additional equity contributions from the Joint Venture partners.  Per the agreement of the members of the Joint Venture, hotel proceeds were channeled to the CP Trust in the form of rent payments between the CP Trust (the ownership entity), and Hoteles del Cabo (the operating subsidiary, discussed more in the next section).

59.     Despite its construction and financing challenges, the Resort opened to much fanfare and acclaim in July 2009.  Since that time, through the efforts of Capella (the Hotel Operator), Farallon, and Cargill, the Resort has become one of the most profitable luxury resorts in all of Mexico.  In 2012, the Resort received AAA's Five Diamond Award, one of the highest and most exclusive honors a hotel can receive.

## The Joint Venture Forms Hoteles Del Cabo and HOA

60.     Shortly before opening the Resort, the Joint Venture formed a hotel operating company for the hotel portion of the Resort, and a civil association representing the interests of the fractional interest holders.

61.     The Technical Committee established Hoteles Del Cabo ("Hoteles"), owned by the CP Trust and HVI, as the hotel operating company.

62.     The CP Trust, at the direction of Cargill, also formed a civil association, the Home Owners Association ("HOA").  HOA represents the interests of the fractional interest owners.  Fractional ownership is a method of ownership commonly used in high end real estate in which several unrelated parties can share in, and mitigate the risk of, ownership.

**In Further Breach of Its Fiduciary Duties, Cargill Appoints RHF as Asset Manager of the Resort, Without Disclosing to Farallon that RHF Is Owned by CarVal and Controlled by Cargill**

63.     In 2011, the Joint Venture determined that it needed to replace the Resort's asset manager, the Santa Monica Group.

64.     Cargill proposed that the Technical Committee replace the Santa Monica Group with Ramsfield Hospitality Finance ("RHF").

65.     But Cargill intentionally failed to disclose that RHF was in fact a venture between Cargill entity CarVal and Ramsfield Real Estate, a hotel real estate investor, lender and asset manager created by Richard Mandel, RHF's president, their preferred choice.  Cargill hid that it was an owner of, and, in fact, controlled RHF.

66.     Based on Cargill's representations, the Technical Committee agreed to remove the Santa Monica Group and enter into a contract with RHF on February 24, 2011.

67.     Upon information and belief, RHF is largely capitalized by and controlled by Cargill.  RHF senior advisor Paul J. Mullaney is in fact a managing director at CarVal and has been a Cargill employee since 1987.

68.     If any Cargill representative had informed Juan Diaz Rivera or any other Farallon representative that RHF was an entity so closely associated with Cargill, Farallon would not have agreed to hire RHF as the asset manager or would have, at the least, insisted that termination rights be agreed upon which eliminated the inherent conflict of interest raised by making RHF—which is completely under Cargill's control—responsible for the interests of Cargill and Farallon jointly.

69.     Farallon would have refused RHF's appointment had full disclosure been made with good reason: this conflict of interest undermined the Joint Venture and contributed greatly to the series of events that give rise to this action.

70.     Since it was retained, RHF has repeatedly breached its Asset Manager Agreement with the CP Trust, but Cargill representatives continue to keep RHF on as the asset manager and pay its fees out of the proceeds of the Resort without the consent of Farallon.

71.     Each of these breaches harms Farallon, the Joint Venture, and the Resort itself.  But, because it benefits Cargill and allows it to maintain its ill-gained control over the Project, Cargill continues to work with RHF.

### The CP Trust Defaults and Cargill Purchases the Debt

72.     On January 7, 2011, WestLB informed the Technical Committee that it was unwilling to provide the second extension of the Construction Loan, and noticed an event of default.

73.     At this time, WestLB and the Technical Committee had discussions about restructuring the Construction Loan to resolve the issues.

17

74.     WestLB originally seemed amenable to this idea.

75.     In addition to their discussions about a possible restructuring of the Construction Loan, the Technical Committee and WestLB had ongoing communications regarding a plan for the CP Trust to continue to make payments on the Construction Loan on a rolling basis from closings of sales of full and fractional units as they occurred.

76.     Seemingly separate from what was happening at the Resort, in late 2010, Cargill terminated nearly its entire Latin America investment management team, and, in January 2011, replaced Bernier, Cargill's representative in the Joint Venture (and Technical Committee member), with Thomas Huettner.  Cargill claimed that Huettner was its "work out guy."  Cargill also began to divest itself of its real estate projects in Latin America, save for the Resort.

77.     The Technical Committee then negotiated two forbearance agreements with WestLB.  During these forbearance periods, WestLB indicated they would restructure the Construction Loan to the benefit of the Project if the parties agreed on terms they could present.  Cargill, however, repeatedly explained that it would not support a restructure unless Cargill and its entities had control of the venture, accusing the Diaz Rivera family of "greenmail" for not wanting to relinquish their majority control in return for Cargill agreeing to the Construction Loan restructure.

78.     Communication between Farallon and Cargill from this point on took on a confrontational tone, making Cargill's intent clear:  Cargill wished to own the entire Resort for its own benefit at the expense of Farallon.

79.     In line with Cargill's intent, Huettner repeatedly employed heavy-handed tactics to attempt to force Farallon and the Diaz Rivera family to submit to Cargill's aims, despite the fact that Farallon was the majority shareholder in the Project. Huettner's methods, beginning in 2011 and continuing to this day, included:

a.  Reneging on agreements reached at the Technical Committee level by Adam Bernier to pay members of Farallon personal loans;

b.  Unilaterally stopping payment of compensation to members of Farallon and the Diaz Rivera Family employed by the CP Trust, including Juan Diaz Rivera, without notice or cause;

c.  Terminating, without notice or cause, Veronica Pacheco, the office manager of the CP Trust, and Efren Medina, the Project's controller, by unilaterally refusing to approve payments due to them;

d.  Reneging on the commitment Cargill previously made to re-structure and re-document the Mezzanine Loan in such a way that protected Farallon's interest;

e.  Blocking, without cause, two homes sales already made on the Resort, which led to litigation with the agent involved in those sales, who, as negotiated by the Technical Committee, was due a commission payment for bringing an acceptable offer to the venture.

80.     Each of these actions placed the CP Trust in a cash constrained position which would force the members of the Technical Committee to submit to Cargill's will. The Diaz Rivera family has an enormous portion of its wealth and equity involved in

the Resort.  Cargill, meantime, had many tens of billions in cash and assets all over the rest of the world and could easily sustain a difficult revenue time at the Resort.

81.     During the forbearance period, Farallon learned that Cargill was attempting to purchase the Construction Loan from WestLB.  Farallon asked Cargill not to purchase the loan itself without additional consent from Farallon.

82.     Cargill's representative and Technical Committee member, Thomas Huettner, admitted to Farallon that Cargill's intent was to hold the Construction Loan in default until Farallon relinquished control, and, if needed, would exercise the rights under the Construction Loan to foreclose and eliminate Farallon's equity as a way to intimidate or threaten Farallon into relinquishing control.

83.     When Farallon learned this, it proposed that the Joint Venture purchase the Construction Loan together.  Cargill again refused to participate with Farallon unless Farallon gave up its majority control of the Project.  Upon information and belief, Cargill—a major financial player in the world that engages in substantial financial transactions with many of the world's largest and most sophisticated banks— in fact told WestLB to refuse any offers by Farallon to purchase the debt.

84.     In another attempt to fulfill its obligations under the Construction Loan, Farallon obtained a letter of intent from Banorte, a Mexican bank, to pay off the Construction Loan.  Again, Cargill refused to support the Banorte deal, unless Farallon relinquished its majority control.

85.     Farallon re-submitted the offer on behalf of Farallon, and WestLB declined, claiming it could not sell the debt to a related party.

86.     Yet, in February 2014, WestLB eventually sold the debt to Cargill SOFOM, an entity owned and controlled by Cargill.  At this time, Cargill contacted WestLB and presented its plan to either purchase the Construction Loan at a discount or to allow the Project to go into foreclosure, where a Cargill-related entity could then purchase the entire Project at a discount, eliminate Farallon as an owner, wipe out all unsecured creditors, and end up with full control and sole ownership of the Project, free and clear of any obligations to Farallon and the other investors in the Project.

87.     Cargill, through its entity Cargill SOFOM, became the sole lender and administrative agent under the Construction Loan.

88.     After it purchased the loan, Cargill SOFOM, at the direction of Cargill, continued the foreclosure proceedings in Mexico on the beneficial interests in the CP Trust, taking a far more aggressive stance than had WestLB, and exercising rights that WestLB had refrained from exercising.

89.     Cargill has not yet finalized foreclosure upon the Resort, but, instead, only on the beneficial interests in an attempt to wrest control of the Project from Farallon, violating the implied-in-fact contract of the Joint Venture.  This is precisely as Cargill previously threatened when Huettner tried to "greenmail" Farallon into relinquishing control of the Project.

90.     Cargill is now playing a cross border shell game in which it is effectively wiping out Farallon's equity in the Project by controlling the asset, paying itself, and in the interim running up the default interest on its Construction and Mezzanine Loans

(which is owed to Cargill itself), and which, to this date, Cargill has refused to restructure.

91.    In direct contravention of Mexican law, Cargill then used a provision in the Construction Loan Agreement to unilaterally pass a resolution on June 4, 2014, which excluded Farallon from the books and records, as well as the business premises of the Joint Venture, removed Farallon's representative from the Technical Committee, and allowed it to take control of the Project to the detriment of the Joint Venture.

92.    Cargill has since caused the Joint Venture to breach multiple agreements with various entities associated with the operations of the Resort, including the Operating Agreement with Capella.

93.    This is not what either partner in the Joint Venture—and certainly not Farallon—intended when it entered into the Joint Venture agreement with Cargill to develop and run the Resort.

94.    This is, in fact, not the first time Cargill has abused its role as a lender in dealings with its supposed business partners.  *See, e.g., A. Gay Jenson Farms Co. v. Cargill, Inc.*, 309 N.W.2d 285 (Minn. 1981).

### Cargill Persuades Richard Holland to Join Cargill in a Vote on the Technical Committee to Remove the Majority Shareholder, Farallon, from Control

95.    Cargill coerced the trustee of the CP Trust to validate Cargill SOFOM's purported pledge rights under the Construction Loan Agreement, despite the fact that these pledge rights were no longer valid under Mexican law.  Cargill claims these pledge rights allow it to remove Juan Diaz Rivera—the Diaz Rivera family member who

had long taken lead on the Project—from the Technical Committee and take control of the Joint Venture and the Technical Committee through its wholly owned and controlled company Cargill SOFOM.

96.     Cargill continued with its misconduct.  It then threatened the remaining non-Cargill Technical Committee member Richard Holland with extensive litigation if he did not agree to sign a shareholder assembly which replaced all members of Farallon on the board of the operating company, Hoteles del Cabo, with members of CarVal, another Cargill entity.

97.     After the Diaz Rivera family, through Farallon, resisted for years as best as it could Cargill's series of misconduct, Cargill ramped up its intimidation scheme to a new level in late 2014.  In what Cargill claims was an attempt to serve notice of process on Farallon member Juan Diaz Rivera, Cargill had its service processors physically assault Juan Diaz Rivera's wife in the driveway of their home, in front of their children.

**Cargill Uses Its Unauthorized Control to Interfere with Farallon's Business Interests**

98.     After Cargill unilaterally took control of the Project by August 2014, it initiated a campaign to damage Farallon's business relationships.

99.     As described above, Cargill used its influence to interfere with the Farallon's interactions with WestLB.

100.    Cargill also interfered with Farallon's relationship with the Gleason family.  The Diaz Rivera family and the Gleason family had a relationship which predates the involvement of Cargill in the Project.  But, once Cargill's "work out guys" became involved with the Project, they began to drive a wedge between the Gleasons

and Farallon.  Cargill told the Gleasons that Farallon attempted to benefit economically

at the expense of the Project and the Gleasons.  This is false.

101.    While Farallon denies these allegations and Cargill provided no evidence

supporting such statements, the Gleason family—which previously had made regular

investments into the Diaz Rivera family's projects—now refuses to work with Farallon

or the Diaz Riveras.

102.    Cargill similarly interfered with Farallon's relationship with the fractional

interest holders.  In or around late November, after Cargill took over the Project in the

summer and fall of 2014, Cargill stated on a conference call with the fractional interest

holders that Farallon was completely out of the Project.  This was not only false, but

hurt Farallon's relationships with the various owners.

## Cargill Uses Its Unauthorized Control to Break the Agreement With Capella and Installs Its Own Resort Manager

103.    In October 2014, Cabo was hit by a devastating hurricane, Hurricane

Odile, which caused many of the properties located there, including the Resort, to close

down for several months to conduct extensive repairs.  The Cargill Parties saw this

closing as an opportunity to further their unauthorized control of the Project.

104.    On November 3, 2014, Cargill's representative and Technical Committee

member Matthew Bogart (who had replaced Thomas Huettner), accompanied by

counsel for Cargill and a private security force of approximately 40 members of the so-

called "transition team", entered the premises of the Resort and forcefully ejected

Capella (the manager of the Resort appointed by Farallon and the Cargill Parties jointly)

from the property in direct contravention of the Operating Agreement, and delivered a purported Termination Notice to the Resort's general manager and Hoteles employee, John Volponi.

105.    Immediately upon improperly ejecting Capella from the Resort, Cargill and its affiliates posted a new website purporting to re-brand the Resort as the "Resort at Pedregal."   Indeed, Cargill is even boasting about the "Resort at Pedregal" using awards and accolades received by Capella.

106.    Defendants also issued a press release on November 4, 2014, stating that they were taking over the Resort.   This led to Capella and Plaintiff receiving a flood of inquiries from the marketplace regarding the ownership and management of the Resort.

107.    Further, the actions of Defendants threatened to harm the Resort's employees.   These employees are employed by a Mexican entity under the sole control and authority of Capella.   Without any authority, Cargill and Bogart now claim to have the ability to direct these employees and have done so to Defendants' sole benefit.

108.    While Capella and the Resort employees were plainly injured by Defendants' misconduct, Farallon was also damaged.   Defendants' ultra vires actions breached the fiduciary duties they owe to the majority shareholder in the Project, Farallon, both in Cargill's capacity as a partner in the Joint Venture, and in Bogart and Huettner's capacity as members of the Technical committee.

109.    On November 7, 2014, Cargill and Bogart, using their private security force, refused entry to Capella's manager, Volponi, and circulated a press release that announced that Capella had been ejected from the Resort.   Cargill and Bogart further

issued a press release to the former guests of the Resort to inform them that the "struggling" Capella Hotel Group had been terminated.

110.    In December, 2014, Cargill began to refuse Capella entry to the Resort in the face of a Mexican court order to the contrary.

## Cargill Plans to Open the Resort on January 31, 2015, Under a New Name and With Sub-Standard Accommodations, Thus Harming the Project's Brand

111.    Now Farallon has learned that the Resort, closed since the damage caused in October 2014 by Hurricane Odile, is to open in approximately one week of the filing of this Complaint.  Cargill announced new management in November, 2014, with a man named Robert Holland (no relation to Technical Committee member Richard Holland) at the helm.  Robert Holland's experience is as the manager of several 3 to 4 star convention travel hotels.  He lacks any experience whatsoever as the manager of a luxury resort such as Capella Pedregal.

112.    Cargill's hiring of Robert Holland as manager has caused wide spread concern as to the quality of the Resort's services given his complete lack of understanding of the luxury industry.  This is particularly concerning as Robert Holland has been overseeing the repairs to the Resort after Hurricane Odile, and has been training the Resort staff for the past four months at his substandard level.

113.    When it unilaterally removed Capella from management, Cargill initiated a press release war with Capella, posting contradictory and at times false statements on Facebook regarding the ownership and management of the Hotel.

114.    Cargill sent similar, confusing statements to the fractional interest holders.

115.    Cargill now plans to open the Resort on January 31, 2015, under the new name The Resort at Pedregal, at reduced rates (when, as the first luxury resort to open in the area, it could in fact charge increased rates), and with no input from Farallon.

116.    Under Cargill's direction, RHF, the asset manager installed by Cargill, is forcing the Resort employees to use low quality products throughout the Resort which are not up to the luxury standards originally agreed upon by Farallon and Cargill and implemented by Capella.

117.    Further, the Resort will be opening at only a partial capacity, has advertised "introductory rates" which are well below what they should be, and will be operating while substantial repairs continue through March.  This, with the lowered standards of service Cargill's new management is providing, will harm the Resort and its majority shareholder, Farallon.

118.    Recently, members of Farallon have heard that Cargill further plans to open the Resort without having obtained essential equipment or making some of the necessary repairs to meet its previously imposed quality standards.

119.    The members of Farallon were also told that Cargill hired a new security force that controls all entrances and exits to the Resort and oversees all operations. Since Cargill illegally notified Capella of its termination, Resort employees have stated they feel constantly watched and are uncomfortable with the new security presence.

120.    The new general manager installed by Cargill has little to no contact with the day to day running of the Resort, further contributing to the sub-par standards and operations which harm Farallon and its brand.

27

121.    All of this conduct threatens to harm the long-term potential of the Resort, as well as the Project's shareholders, including its majority shareholder, Farallon. Cargill's conduct regarding the opening of the Resort is also in direct contravention of the Joint Venture agreement.

122.    Cargill has refused to allow the manager appointed by the Joint Venture, Capella, on the property despite a Mexican court order, presents itself as the representative of the individual HOA owners (despite not being a member of the HOA), and refuses to pay severance to the former employees of the Project that Cargill has recently removed (again without authority), including John Volponi and Juan Diaz Rivera.  This is against the intent of the Joint Venture and breaches the duties of good faith and fair dealing that Cargill owes to the Joint Venture.

123.    Cargill is now forcing the opening of the Resort in order to further its takeover of the Project and continue to push out the Diaz Rivera family.  This is not in the best interest of the Joint Venture and the Project's majority shareholder, Farallon.

124.    Even as Farallon files this Complaint, Cargill continues to add to its four years of misconduct in order to make its takeover of the Resort complete.  As noted above, Farallon and the Diaz Rivera family have a substantial portion of their wealth invested in the Resort.  Giant Cargill, on the other hand, can withstand a reduction in value of the Resort as it breaches its duty and perpetrates torts in order to force Farallon out of ownership.

## FIRST CAUSE OF ACTION

**(Breach of Fiduciary Duty, Joint Venture – Cargill, Cargill Financial, CarVal, Bogart, Huettner)**

125.    Plaintiffs repeat and reallege the allegations made above as if fully set forth herein.

126.    As members of a Joint Venture with Farallon for the Project, Cargill, Cargill Financial, and CarVal owed fiduciary duties to Farallon.  They each violated this duty by exploiting their self-interests and seizing upon a perceived opportunity to sabotage the Project and to obtain a windfall profit by eliminating the interests of Farallon.

127.    As members of the Technical Committee, Bogart, and Huettner each owed fiduciary duties to majority shareholder Farallon.  They each violated this duty by acting in their self-interest and in placing the interests of the minority shareholder, Cargill, above that of the majority shareholder, Farallon.

128.    Defendants all owed a duty of good faith and fair dealing to Farallon, and they breached this duty by their actions which conflict with the best interests of all investors in the Project, in favor of their perceived opportunity to pursue the Project as a distressed asset.

129.    Defendants exploited the Project for their own financial gain, in violation of their fiduciary duties to Farallon.

130.    The misconduct of Defendants was intentional, willful, wanton, and malicious and of such egregious nature that punitive damages are appropriate in addition to compensatory damages for the immense harm done to Farallon.

131.    Farallon was damaged by Defendants' breaches of fiduciary duty in an amount of at least $19,300,000.

## SECOND CAUSE OF ACTION
### (Aiding and Abetting Breach of Fiduciary Duty – RHF)

132.    Plaintiff repeats and realleges the allegations made above as if fully set forth herein.

133.    Cargill, CarVal, Bogart, and Huettner breached their fiduciary duties to Farallon as described above.

134.    RHF knowingly participated in Cargill's, Cargill Financial's, CarVal's, Bogart's, and Huettner's breaches of fiduciary duty when it failed to disclose that it was owned by CarVal and controlled by Cargill when it was brought on as asset manager.

135.    RHF knowingly participated in Cargill's, Cargill Financial's, CarVal's, Bogart's, and Huettner's breaches of fiduciary duty when it worked in concert with Cargill, CarVal, Bogart, and Huettner to aid Cargill in its self-dealing.

136.    RHF continues to knowingly participate in Cargill's, Cargill Financial's, CarVal's, and Bogart's breaches of fiduciary duty by requiring the Resort to employ substandard accommodations and services, and by assisting in the reopening of the Resort.

137.    Farallon was damaged by RHF's aiding and abetting breaches of fiduciary duty in an amount of at least $19,300,000.

## THIRD CAUSE OF ACTION
### (Tortious Interference with Current Business Relationships – Cargill, Cargill Financial, CarVal, Huettner, Bogart)

138.   Plaintiff repeats and realleges the allegations made above as if fully set forth herein.

139.   Prior to the commission of the wrongful acts by Cargill, Cargill Financial, CarVal, Huettner, and Bogart, Farallon maintained a valuable business relationship with the Gleason family.

140.   Prior to the commission of the wrongful acts by Cargill, Cargill Financial, CarVal, Huettner, and Bogart, the Gleason family, through the Gleason Family Foundation, granted a $6 million loan to the Trust for pre-development funding.

141.   The business relationship between Farallon and the Gleason family helped establish the Project, which has resulted in a world-renowned and highly profitable luxury resort.

142.   Cargill damaged Farallon's relationship with the Gleason family by representing to them that Farallon had taken advantage of the Project in many ways that enriched itself at the Gleason's benefit.

143.   Cargill accused Farallon of "greenmailing" the Project, intending to unduly benefit from the Project at the expense of Cargill and the Gleason's positions.

144.   Cargill made these representations with the intent to damage the relationship between Farallon and the Gleason family.

145.   As a result of Defendants' improper interference, the Gleason family broke away from Farallon both in business and personal relationships.

31

146.    By interfering, Defendants damaged Farallon's relationship with an integral member of the development of the Project, interfering with potential profitable business endeavors with the Gleason family.

**FOURTH CAUSE OF ACTION**
**(Breach of Implied Contract, Joint Venture – Cargill, Cargill Financial, CarVal)**

147.    Plaintiffs repeat and reallege the allegations made above as if fully set forth herein.

148.    Cargill, through Cargill Financial and CarVal, entered into an agreement with Farallon to develop and run the Resort as a Joint Venture and to share jointly in the ownership of the Project.

149.    Cargill, CarVal, and Farallon agreed that Farallon would hold 55.22% of the ownership and Cargill's wholly controlled entity, Mexvalo, would hold 44.78%.

150.    Cargill, through Cargill Financial and CarVal, and Farallon agreed that a representative of Farallon, a representative of HVI, and a representative of Cargill would each have a seat on the Technical Committee.

151.    Farallon performed all of their obligations under the contract.

152.    Cargill, through Cargill Financial and CarVal, breached the Joint Venture Agreement when Cargill caused its wholly controlled financial company, Cargill SOFOM, to purchase the Project's debt and wrongfully take control over the Technical Committee and the Project.

153.    Cargill, through Cargill Financial and CarVal, breached the Joint Venture Agreement when they removed Juan Diaz Rivera from the Technical Committee and failed to replace him with another representative of Farallon.

154.    Cargill, through Cargill Financial and CarVal, breached the Joint Venture Agreement by running the Resort at a standard far below the luxury resort standard the Parties agreed upon when entering into the Joint Venture.

155.    Cargill, through Cargill Financial and CarVal, breached the Joint Venture Agreement by unilaterally terminating Capella, the hotel management company agreed to by the Joint Venture.

156.    Cargill, through Cargill Financial and CarVal, breached the Joint Venture Agreement by pushing Farallon out of the management of the Project.

157.    The Farallon Parties were damaged by the Cargill Parties' breaches in an amount of at least $19,300,000.

## FIFTH CAUSE OF ACTION
### (Unjust Enrichment – Cargill, Cargill Financial, CarVal)

158.    Plaintiffs repeat and reallege the allegations made above as if fully set forth herein.

159.    Cargill, Cargill Financial, and CarVal were enriched by their actions as set forth above.

160.    The enrichment of Cargill and CarVal was unjust and was at the expense of the Farallon Parties.

161.    The circumstances are such that equity and good conscience require Cargill and CarVal to make restitution to Farallon.

## SIXTH CAUSE OF ACTION
### (Accounting – Cargill, Bogart)

162.    Plaintiff repeats and realleges the allegations made above as if fully set forth herein.

163.    Farallon and Cargill entered a relationship of a mutual and confidential nature when they formed a Joint Venture to develop and run the Resort together.

164.    Farallon and Bogart entered into a relationship of a mutual and confidential nature when Bogart became a member of the Technical Committee overseeing the Project, of which Farallon is the majority shareholder.

165.    Since Cargill unilaterally removed Farallon's representative from the Technical Committee in June, 2014, Farallon has not had access to the books and records of the Project.

166.    Farallon has no adequate legal remedy to obtain information regarding their Property in which it is a majority shareholder.

## PRAYER FOR RELIEF

WHEREFORE, by reason of the foregoing, Plaintiff respectfully requests that the Court enter judgment in Plaintiff's favor and against Defendant, awarding:

A.  An accounting from August 2014, when Juan Diaz Rivera was removed from the Technical Committee, to the present;

B. An injunction prohibiting Defendants from exercising its veto power in any vote to refinance the outstanding debt of the Project;

C. An injunction ordering Defendants to allow Juan Diaz Rivera or some other representative of the Farallon Parties to serve on the Technical Committee;

D. At least $19,300,000 in compensatory damages for the loss of its interest in and use of their Property due to the misconduct of the Enterprise.

E. Applicable interest on the foregoing amount;

F. Punitive damages in amount to be determined at trial;

G. Such other and further relief the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff respectfully demands a trial by jury for all issues so triable in this action.

Dated: New York, New York
      January 23, 2015

By: _____
John G. Balestriere
Jillian L. McNeil
**BALESTRIERE FARIELLO**
225 Broadway, 29th Floor
New York, New York 10007
Telephone:   (212) 374-5401
Facsimile:   (212) 208-2613
john.balestriere@balestrierefariello.com
jillian.mcneil@balestrierefariello.com
*Attorneys for Plaintiffs*